UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DAYSHAWN RIVERS,

                              Plaintiff,

                                                        Case # 18-CV-6898-FPG
v.

                                                        DECISION AND ORDER

DR. YOUNG SUNG JUN,

                              Defendant.

## INTRODUCTION

Plaintiff Dayshawn Rivers brings this civil rights action against Defendant Dr. Young Sung Jun, alleging that Defendant was deliberately indifferent to his medical needs while he was an inmate at Wyoming Correctional Facility.  Currently before the Court is Defendant's motion for summary judgment.  ECF No. 52.  For the reasons that follow, Defendant's motion is DENIED.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor.  *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  However, the non-moving party

1

"may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

## BACKGROUND

The following facts are derived from the summary-judgment record, as viewed in the light most favorable to Plaintiff.  The time period relevant to Plaintiff's claim is November 2017 to November 2018.  During this time, Plaintiff was an inmate at Wyoming Correctional Facility. Defendant worked as a full-time physician at the facility.

The parties' first interaction occurred on November 9, 2017.  *See* ECF No. 56-6 at 9.  On that day, Plaintiff met with Defendant complaining of a painful "boil" on his right buttocks.  *Id.* Plaintiff told Defendant he had had the condition "for about three months."  ECF No. 52-3 at 2. Defendant prescribed Plaintiff two antibiotics and told Plaintiff to follow up with him in two weeks.  *Id.*

Plaintiff began suffering from additional symptoms, which he believed were side effects from the medication, including pain behind his right eye, vomiting, shaky nerves in his right hand, and blisters.  ECF No. 56-6 at 10.  On November 28, 2017, Plaintiff met with a nurse, complaining that his boil had "popped" and that he was suffering from side effects due to the medications.  *Id.* at 11.  The nurse observed "drainage" coming from the area.  She scheduled an appointment with Defendant, and Plaintiff met with Defendant on December 1, 2017.  *Id.*  Defendant "took a culture" of the affected area for further testing.  Plaintiff testified that Defendant never informed him of the results of that culture.  *Id.*

The pain resulting from the boil worsened.  *Id.*  If Plaintiff sat down, the boil would "pop[] open" and cause blood to drain from the area through his clothing.  *Id.* at 12.  Plaintiff testified that

even just "moving around" in his daily activities was "killing [him]." *Id.* Blood was draining from the boil on a daily basis. *Id.*

On December 21, 2017, Plaintiff returned for sick call, continuing to complain of pain from the boil. ECF No. 62 at 24. The pain was such that he could "hardly" sit down. *Id.* The nurse noted that the boil was a "palpable" mass and that drainage was occurring. The nurse scheduled an appointment for Plaintiff with Defendant, and directed him not to pick or pop the boil and to use a warm compress on the area. *Id.*

On December 22, 2017, Plaintiff met with Defendant. Defendant prescribed antibiotics, along with ibuprofen for the pain, and told Plaintiff to schedule a follow-up appointment in two weeks. ECF No. 62 at 24.

Plaintiff continued to suffer from side effects despite the medication change. Plaintiff testified that he was vomiting two times per day. ECF No. 56-6 at 13. The skin around the area of the boil "started getting real darkish" and "peeling." *Id.* at 14. The boil had increased in size and was discharging a substance "green" in color. *Id.* At a January 5, 2018 appointment, Defendant believed the boil was "resolving," but he prescribed lotion given the blisters and skin issues. ECF No. 62 at 23.

On January 23 and 24, 2018, Plaintiff met with nurses and continued to complain of drainage from the boil. *Id.* at 22-23. On January 26, 2018, Defendant met with Plaintiff and observed that the boil was "open" and "draining." ECF No. 52-3 at 3. Defendant prescribed Plaintiff with the same antibiotics previously prescribed. ECF No. 52-3 at 3. Plaintiff testified that Defendant told him there was "nothing for him to do" except antibiotic medication. ECF No. 56-6 at 15.

On February 9, 2018, Plaintiff had an appointment with Defendant. ECF No. 62 at 21. He complained that he had developed blisters on his penis. Defendant observed that the wound was closed. ECF No. 62 at 21. When Plaintiff complained that he was unable to sit down and was bleeding "all day," Defendant told Plaintiff to "suck it up" and "wait it out." ECF No. 56-6 at 15. At a February 23, 2018 appointment, Defendant noted that the boil was draining again, so he prescribed the same antibiotic medication and provided "wound care." ECF No. 52-3 at 3.

From March 2018 to May 2018, little progress was made on Plaintiff's boil. It continued to reopen and was "killing him." ECF No. 62 at 19; *see also* ECF No. 52-3 at 3-4. Furthermore, a mass also developed on Plaintiff's left buttocks. ECF No. 52-3 at 3. Plaintiff went so far as to file a grievance against Defendant, hoping that he could get a new doctor who would actually "help [him] situate this problem." ECF No. 56-6 at 18. When Plaintiff asked for stronger antibiotic medication like penicillin, Defendant told him the State could not afford to pay for it. *Id.* at 19. Defendant also joked about Plaintiff's condition, telling him he might "lose a few pieces of [his] hind quarter." *Id.* At one point in April, Defendant told Plaintiff that he would not schedule him for surgery until he could find out why Plaintiff was not responding to the antibiotic medication. *Id.* Plaintiff was continuing to suffer from pain in his buttocks, stomach problems, and shaky nerves in his right hand. *Id.* Plaintiff testified he was "going crazy" due to his symptoms. *Id.*

On May 10, 2018, Defendant requested a "general surgical evaluation for excision of [the] wound of left buttock" and surgical evaluation of two lesions in the area of Plaintiff's groin. ECF No. 62 at 29-30. Jeffrey Jordan, a general surgeon at Wende Correctional Facility, believed surgical intervention was unnecessary on the left buttock because there was no mass to excise and because the wound was "fully healed" without tenderness or drainage. *Id.*

Soon thereafter, the wound on the right buttocks reopened, ECF No. 62 at 15, and on May 29, 2018, Defendant again referred Plaintiff for consultation.  ECF No. 62 at 31.  Defendant asked "for reevaluation of excision of right buttock wound to prevent recurrence."  ECF No. 62 at 31.  A consultation was held on June 21, 2018 with William Flynn, M.D., who recommended "exploration and excision of the wound under general anesthesia," to be performed "in six to eight weeks."  ECF No. 52-3 at 6.

The surgery was not conducted within that timeline.  Plaintiff's wound continued to reopen and drain.  ECF No. 62 at 13.  There were no medical appointments held between early July 2018 and late August 2018.  Plaintiff testified that he kept "putting in for sick calls" every other day because of the constant pain and drainage but he was not called down for appointments.  ECF No. 56-6 at 20-21.  Plaintiff had several more appointments in Fall 2018 to address the pain and drainage he continued to have.  *See* ECF No. 62 at 7-12.  He continued to raise his complaints to Defendant.  *See* ECF No. 56-6 at 21.  When Plaintiff requested to be seen at an "outside hospital," Defendant told him there was not enough money to do so.  *Id.*  He also tried to assuage Plaintiff's concerns by telling him to be patient and that he was on the list for surgery.  *Id.* at 21-22.

Defendant left his employment at Wyoming Correctional Facility on November 1, 2018.  ECF No. 52-3 at 7.  In mid-November 2018, the boil on Plaintiff's right buttocks got as big as a "softball," and another physician at the prison sent Plaintiff to Warsaw Hospital for emergency surgery.  ECF No. 56-6 at 22.  The boil was excised at Warsaw Hospital.  *Id.* at 22-23.  Plaintiff testified, however, that the surgery did not fully resolve the issue, and his right buttocks continues to suffer from pain and drainage since the surgery.  *Id.* at 23.

On December 10, 2018, Plaintiff, then acting *pro se*, filed the present action.  ECF No. 1.  After screening, the only claim that proceeded to service was one arising under 42 U.S.C. § 1983,

based on Defendant's alleged deliberate indifference to Plaintiff's medical needs, in violation of the Eighth Amendment.  ECF No. 9.

## DISCUSSION

Defendant argues that summary judgment is appropriate because Plaintiff has presented insufficient evidence to satisfy either the objective or subjective prong of a deliberate indifference claim.

"In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Wright v. Genovese*, 694 F. Supp. 2d 137, 153 (N.D.N.Y. 2010) (internal quotation marks omitted). This standard consists of two elements: "The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind." *Id.* The Court addresses each prong below.

### I.   Objective Prong

Under the objective prong, "the plaintiff must show that the alleged deprivation of medical care was sufficiently serious." *Horace v. Gibbs*, 802 F. App'x 11, 14 (2d Cir. 2020) (summary order) (internal quotation marks omitted).  "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).  If the gravamen of the claim is the complete failure to provide treatment for an inmate's condition, "courts examine whether the inmate's medical condition is sufficiently serious." *Id.*  "In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower.  For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or

interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* (internal quotation marks and brackets omitted). "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012).

Defendant argues that he provided "continuous and appropriate medical care" for Plaintiff's condition, and therefore the objective prong cannot be met. ECF No. 52-7 at 9. Viewing the record in the light most favorable to Plaintiff, the Court disagrees. While it cannot be disputed that Defendant provided some medical care throughout the relevant period, a reasonable jury could find that such care was so inadequate as to constitute a sufficiently serious deprivation.

Plaintiff has proffered the expert reports of Michael Moffa, M.D., who avers that Plaintiff was suffering from what is known as a "perianal abscess." He explains:

> The condition is the result of infection of the perianal glands that secrete lubrication into the anal canal during a bowel movement. The glands, however, can become obstructed. This leads to buildup of secretions inside the gland, infection due to its location and subsequent abscess formation. The pus then accumulates and burrows its way out toward the skin. Sometimes it has to be cut open and drained, other times it can spontaneously drain out onto the skin as was the case with [Plaintiff].
>
> Once it is drained, one of two things can happen. Either due to scarring and healing, the original gland and internal opening scars over and the tract is obliterated and everything heals up on its own [within three to four weeks]. This happens about 50% of the time. The other half of the time is what occurred in [Plaintiff's] case. The internal opening can stay open and it continuously allows for infected mucous and stool to get into the "tract" or "tunnel" where it then festers and intermittently spits out as infection. This condition is called a perianal fistula and is what [Plaintiff] developed. This condition is not treated with antibiotics. It is a surgical problem requiring an operation called a fistulotomy.

ECF No. 65-1 at 2-3.  To Dr. Moffa, the fact that Plaintiff had been suffering from abscesses for several months prior to November 2017, and had not responded well to antibiotics initially, proved unequivocally that his condition was chronic and required a surgical solution.  ECF No. 65-2 at 1-2.  Therefore, Defendant's treatment protocol—antibiotics, superficial wound care, and drainage—was futile and "virtually guarantee[d]" that Plaintiff would "suffer recurrence," ECF No. 65-1 at 3, leading to "more aggressive [tunneling] and spreading of the infection and ongoing severe pain." ECF No. 65-2 at 2.

Dr. Moffa's opinion dovetails with Plaintiff's claimed experience.  A reasonable jury could find Plaintiff repeatedly suffered from significant, chronic pain throughout the relevant period. Plaintiff testified that "just moving around" was "killing [him]."  ECF No. 56-6 at 12.  He was going "crazy" from the pain and the "nonstop draining."  *Id.* at 19, 21; *see also Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (serious medical condition may exist where it causes "chronic and substantial pain").  He was unable to sit down, which sometimes interfered with his ability to participate in facility programming and take meals in the cafeteria.  *See* ECF No. 56-6 at 12, 17; *see also Chance*, 143 F.3d at 702 (serious medical condition may exist where it "significantly affects an individual's daily activities").  Indeed, Plaintiff was on at least one occasion directed to remain on bed rest due to his condition.  *See* ECF No. 56-6 at 17.  Furthermore, the medical records demonstrate that Plaintiff repeatedly sought treatment for the ongoing pain he suffered; his medical providers found his condition worthy of treatment; and Defendant went so far as to refer Plaintiff to medical specialists.  *See Chance*, 143 F.3d at 702 (relevant factors include whether the "injury [is such] that a reasonable doctor or patient would find [it] important and worthy of comment or treatment").  Considered in its totality—not as a discrete injury but as a recurring condition—this level of infirmity and chronic pain is cognizable under the Eighth

Amendment. *See Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003) ("[T]he Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death, but also less serious denials which cause or perpetuate pain.").

Contrary to Defendant's argument, the fact that Defendant treated Plaintiff does not undermine Plaintiff's claim with respect to the objective prong. The thrust of Dr. Moffa's reports is that Defendant's treatment of Plaintiff did not actually serve to treat his condition. While it may have relieved the immediate issue of drainage when Plaintiff attended sick calls, Defendant's treatment protocol also allowed for the "build up of infection," more "aggressive 'tunneling,'" the spread of infection, and "ongoing severe pain." ECF No. 65-2 at 2. In other words, Defendant's treatment was so inadequate as to allow Plaintiff's condition to fester and worsen over time. Consequently, that Defendant provided *some* treatment does not obviate his potential liability under the Eighth Amendment. *See Salahuddin*, 467 F.3d at 280 (noting, for purposes of the objective prong, that "failing to take reasonable measures in response to a medical condition can lead to liability" (internal quotation marks omitted)).

Thus, there is sufficient evidence for a reasonable jury to find that Plaintiff has met the objective prong of his claim.

## II.   Subjective Prong

As to the subjective prong of a deliberate-indifference claim, the Second Circuit has written as follows:

> The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases . . . the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. Although

less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices.  But recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

The charged official must be subjectively aware that his conduct creates such a risk. Prison officials may, of course, introduce proof that they were not so aware, such as testimony that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent. . . .  The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere. Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable.

*Id.* at 280-81 (internal quotation marks and citations omitted).  For these reasons, proof of "medical malpractice" is not enough "by itself to support an Eighth Amendment claim." *Wright v. Rao*, 622 F. App'x 46, 47-48 (2d Cir. 2015) (summary order).  But malpractice "may be actionable under the Eighth Amendment when [it] involves culpable recklessness, that is, an act by a prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Dotson v. Fischer*, 613 F. App'x 35, 39 (2d Cir. 2015) (summary order) (internal quotation marks and ellipsis omitted)).

In this case, there is sufficient evidence for a reasonable jury to find for Plaintiff on the subjective prong.  Dr. Moffa opined that, when Plaintiff first met with Defendant on November 9, 0217, it would have been "clear" to a surgeon with Defendant's experience that Plaintiff was suffering from a chronic anal fistula that required surgical intervention.  ECF No. 65-2 at 2.  The fact that Defendant did not immediately refer Plaintiff to surgery to treat Plaintiff's condition supports an inference of deliberate indifference.  *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); *Bardo v. Wright*, No. 17-CV-1430, 2019 WL 5864820, at *7 (D. Conn. Nov. 8, 2019) (medical expert's opinion concerning what "would be obvious to a reasonable physician" supported inference that prison doctor was deliberately indifferent).

Instead, Defendant prescribed antibiotics, a "futile" approach in Dr. Moffa's view.  ECF No. 65-2 at 2.  A jury could reasonably conclude that this more conservative approach was not the result of sound medical judgment, but the result of Defendant's "ulterior motive" to save money.  *See Chance*, 143 F.3d at 704 (allegation that doctors recommended treatment "because of monetary incentives" permitted inference "that the [doctors] had a culpable state of mind [insofar as] their choice of treatment was intentionally wrong and did not derive from sound medical judgment").  Per Plaintiff's deposition testimony, Defendant told him that he was making treatment decisions at least in part based on the facility's finances, not Plaintiff's medical needs.  *See* ECF No. 56-6 at 19 (stating, in April 2018, that he would not prescribe stronger antibiotics to Plaintiff because "they don't have that type of money to spend on prisoners"); *id.* at 21 (stating, in October 2018, that he would not send Plaintiff to a "hospital outside of the prison system" because "they didn't have the money").

In addition, "[a] jury could infer deliberate indifference from the fact that [Defendant] knew the extent of [Plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [Plaintiff's] situation." *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994).  In the six months after November 2017, Defendant repeatedly prescribed a course of treatment (primarily antibiotic medication and wound care) that brought only temporary relief, followed by recurrent bouts of pain and infirmity.  Defendant's persistence in that ineffective treatment protocol for six months—until he requested a surgical consultation— permits an inference of culpable recklessness.  Indeed, it took nearly one month after Defendant jokingly acknowledged Plaintiff's predicament to actually schedule the surgical consultation.  *See* ECF No. 56-6 at 18-19 (describing April 2018 appointment at which Defendant joked that Plaintiff would "lose a few pieces of [] hind quarter" due to lack of improvement with antibiotics).  Even

after Defendant received a recommendation that surgery be performed to resolve Plaintiff's issue, Defendant never scheduled or otherwise pushed for that surgery in the four months before his retirement in November 2018, during which time Defendant was aware of Plaintiff's continual pain, infirmity, and need for treatment.  *See* ECF No. 56-6 at 21.  It was only after Defendant had retired and Plaintiff's boil had blown up to "the size of a softball" that Plaintiff underwent surgery. ECF No. 56-6 at 22.  In sharp contrast to Defendant's course of treatment—and contrary to Defendant's claim that he had no authority to ensure that surgery occurred in a timely manner, ECF No. 52-7 at 9, 12—Plaintiff's new physician secured surgery for Plaintiff at an outside hospital less than two weeks after Defendant's retirement.  *See* ECF No. 56-6 at 22.

Taken together, these facts permit an inference that Defendant's provision of inadequate medical care involved culpable recklessness, which satisfies the second prong of Plaintiff's deliberate indifference claim.  Therefore, summary judgment is inappropriate.

## CONCLUSION

For the reasons discussed above, Defendant Young Sung Jun's motion for summary judgment (ECF No. 52) is DENIED.  By separate order, the Court will schedule a status conference to hear from the parties on the progress of this action.

IT IS SO ORDERED.

Dated: October 4, 2022
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York